## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COX OPERATING, L.L.C.**<br><br>**VERSUS**<br><br>**M/V ATINA, Et Al** | **CIVIL ACTION NO:  2:20-cv-02845**<br>**c/w 2:20-cv-02871**<br><br>**DISTRICT JUDGE**<br>**HON. JANE TRICHE MILAZZO**<br><br>**MAGISTRATE JUDGE**<br>**HON. DONNA PHILLIPS CURRAULT**<br><br>**APPLIES TO ALL CASES** |

### MEMORANDUM IN SUPPORT OF THE ASSOCIATED BRANCH PILOTS OF THE PORT OF NEW ORLEANS, LLC'S MOTION FOR SUMMARY JUDGMENT

**MAY IT PLEASE THE COURT:**

Third-Party Defendant, the Associated Branch Pilots of the Port of New Orleans, LLC ("the ABP"), is entitled to judgment as a matter of law pursuant to Federal Rule of Civil Procedure 56 on the claims of Hanzhou 1 Ltd, as owner, Atina Maritime Limited, as bareboat charterer, and Besiktas Likid Tasimacilik Denizcilik Ticaret A.S. ("Besiktas") and Ciner Ship Management, as managers of the M/T ATINA, and the M/T ATINA, *in rem*, (collectively, "Limitation Petitioners"), as alleged in Limitation Petitioner's Third-Party Demand and Rule 14(C) Tender (Rec. Doc. 152).

### SUMMARY OF THE ARGUMENT

This is a case in which the crew of the M/T ATINA, a crude oil tanker owned and operated by Limitation Petitioners, attempted to anchor the 898' vessel within 0.7 miles of the SP-57-B platform, a stationary, properly lit oil and gas production platform in the Gulf of Mexico,[1] a

---

[1] *See* Complaint of Cox Operating, LLC, Rec. Doc. 1.

location deemed unsuitable by the Limitation Petitioners' own expert, Capt. David McFarlane.[2] After dropping the anchor, but before it was set and the vessel "safely anchored," the ATINA received a request from the Southwest Pass bar pilots' dispatcher, Ben Kararick, to relocate the vessel to a position at least 4 miles from the nearby sea buoy.[3] The master of the ATINA did not object to or protest this request as unsafe, but instead, agreed to move the vessel further into the anchorage.[4]

During the anchor heaving process, the master and bridge team lost situational awareness, mistook the SP 57-B for a vessel and, ignoring numerous radar-collision warnings, navigated the ATINA directly into the platform. The undisputed facts and evidence – including the results of the Limitation Petitioners' own investigation and corporate testimony – establish that the incident was caused solely by the negligence of Limitation Petitioners, and their employees, specifically Capt. Onür Hürmüzlü, and the bridge team.[5] Capt. Hürmüzlü, at the direction of Besiktas, had assumed the command of the vessel after traveling without sleep for approximately 50 hours.[6] Capt. Hürmüzlü was not provided any opportunity to rest before assuming control of the vessel[7], nor was he allowed time to participate in a sufficient handover review with the disembarking captain to become familiar with the vessel (on which he had never worked).[8]

---

[2] *See* Deposition of Capt. David McFarlane, attached hereto as Exhibit "A" at pp. 133:11-134:11.
[3] *See* Deposition of Ben Kararick, attached hereto as Exhibit "B," p. 29:11-19. The ABP disputes Limitation Petitioners' characterization of Kararick's radio call as an "order" and submits that Kararick's instruction to the vessel was a request that Capt. Hürmüzlü could have declined. Whether Kararick's call was an "order," or a "request" is not material to this motion. Thus, for the purposes of this Motion only, the ABP will not dispute Limitation Petitioners' characterization of the call as a "mandatory order/instruction." *See* Ex. B, 48:13-22 (Kararick testified that he cannot ships to move).
[4] *Id*., at p. 69:15-70:3.
[5] *See* M/T ATINA Vessel Incident Reports, attached hereto as Exhibit "C," at Section B "Immediate Cause(s)"
[6] *See* USCG Interview of Capt. Hürmüzlü, attached hereto as Exhibit "D," at p. 6:8-19.
[7] *Id.*
[8] *Id.*

Discovery has confirmed that no action or inaction on the part of the ABP caused or contributed to the allision and that Limitation Petitioners' claims against the ABP are based solely on the attenuated and legally flawed "but-for" argument that, had the dispatcher not asked the vessel to move, the incident would not have occurred. This attempt by Limitation Petitioners to shift fault for an incident in which their vessel struck a stationary object is without merit.

As set forth herein, summary judgment dismissal of Limitation Petitioners Third-Party Demand (Rec. Doc. 152) is appropriate on three grounds: (1) the ABP cannot, as a matter of law, be held vicariously liable for the acts of its members and/or their agents, including dispatchers; (2) neither the ABP, nor Ben Kararick, owed or breached any duty to Limitation Petitioners and/or the M/T ATINA as to the navigation of the vessel and were not negligent; and (3) the actual, or superseding, cause of the allision was Limitation Petitioners' negligent conduct, not any alleged negligence on the part of the ABP. As such, Limitation Petitioners' claims against the ABP, including the tender of the ABP to Cox Operating, LLC ("Cox") by Limitation Petitioners pursuant to Federal Rule 14(c), should be dismissed in full, and with prejudice.[9]

## **FACTUAL BACKGROUND**

This matter arises out of an allision that occurred in the early morning hours of October 17, 2020 when the M/T ATINA, an 898-foot crude oil tanker, struck the SP 57-B, a manned offshore production platform owned by Energy XXI and EPL Oil & Gas, LLC and operated by Cox.[10] The platform is located near the Southwest Pass Anchorage, an area located to the south and east of

---

[9] Limitation Petitioners' Third-Party Demand contains two sets of claims against the ABP, a direct claim against the ABP for contribution under the general maritime law and a tender of all claims of Cox pursuant to Rule 14(c). This Motion seeks a dismissal of all claims made against, and tendered to, the ABP. Cox has not made any direct claims against the ABP in this matter.

[10] *See* Rec. Doc. 1, Complaint of Cox; *see also* Cox's Second Amendment to Claim in Limitation (Rec. Doc. 182).

3

Southwest Pass in the Mississippi River.[11] Southwest Pass is a narrow, deep-water channel that connects the Mississippi River to the Gulf of Mexico.

Pilotage is compulsory for all foreign vessels in the lower Mississippi River, with the Southwest Pass bar pilots providing compulsory pilotage to and from Pilottown, Louisiana.[12] The bar pilots collectively formed the ABP to act as a provider of room, board, and billing services for the pilots.[13] The ABP collects pilotage fees and disburses those fees to its members, and also arranges for and provides housekeeping, maintenance and dispatcher services to the pilots.[14] The ABP does not have any employees and consists only of the member bar pilots. Thus, the ABP contracted with Maritime Pilot Services, Inc. ("MPSI") for MPSI to provide various services, including dispatcher services to coordinate pilotage and navigation of vessels sailing into and out of the river.[15]

1. *The ATINA's Commercial "Emergency"*

In the days leading up to the allision, Besiktas, the ship management company for the M/T ATINA, was notified that the then-captain of the vessel, Capt. Ayan Edin, was acting "out of control.[16]" Specifically, Besiktas received numerous messages from Capt. Edin in which Capt. Edin threatened to "beat up" Capt. Syed Akhtar, an inspector who was scheduled to board the vessel

---

[11] Rec. Doc. 1 at ¶ 9.

[12] *See* Deposition of the ABP through its representative, Michael Miller, attached hereto as Exhibit "E," at p. 13:2-8.

[13] *See* Ex. E, Deposition of the ABP, at pp. 10:22-11:22.

[14] *See* Ex. E, at pp. 10:22-11:22.

[15] *See* Ex. E, at pp. 10:22-11:22, 14:11-18.

[16] *See* Deposition of Besiktas through its representative, Adil Ozkan, attached hereto as Exhibit "F," at pp. 69:5-71:25, p. 77:2-18.

for a routine Ship Inspection Reporting System ("SIRE") inspection on or about October 14, 2020.[17] At that time, the vessel was safely docked at the NuStar facility in St. James, Louisiana.[18]

In response to receiving the disgruntled messages from Capt. Edin, Besiktas purportedly convened its Emergency Response Team ("ERT") to address the situation.[19] Due to its concern over Capt. Edin's mental state, Besiktas made the decision to send its HSEQ Superintendent, Capt. Sadik Er, to the vessel to oversee the SIRE inspection.[20]  Capt. Sadik traveled from Istanbul, Turkey to the NuStar facility and arrived at the vessel on October 14, 2020, not long before the SIRE inspection began.[21] Shortly after boarding the vessel, Capt. Er witnessed Capt. Edin arguing with Capt. Akhtar.[22] Capt. Er testified that this argument escalated quickly and likely would have become physical had he not intervened.[23]  After defusing the situation, Capt. Er accompanied Capt. Akhtar for the inspection while Capt. Edin returned to his bunkroom.[24] While the inspection was underway, Capt. Edin sent an email to the Besiktas corporate office notifying the company that he had resigned from his position as captain of the vessel.[25]   Besiktas subsequently received a voicemail from Capt. Edin in which he reiterated that he resigned from the company and

---

[17] *Id*. A SIRE inspection is an initiative by the Oil Companies International Marine Forum ("OCIMF") to address concerns relating to sub-standard shipping. The SIRE program is a tanker risk assessment tool in which tanker vessels are inspected to ensure they meet certain shipping and safety standards. *See* https://www.ocimf.org/programmes/sire. These inspections are critical to tanker operations as a vessel cannot carry cargo for major oil companies without SIRE compliance. *See* Ex. F, Deposition of Besiktas (Ozkan), at pp. 38:11-40:8.  SIRE inspections are generally performed on each vessel every 6 months but may be required more or less frequently by the vessel charterer.  *Id*., at pp. 19:25-20:16.

[18] *See* Excerpt from M/T ATINA Deck Logs dated October 14, 2020, ATINA 2026-27, attached hereto as Exhibit "G."

[19]  *See* Ex. F, Deposition of Besiktas (Ozkan), at pp. 77:12-18, 166:1-24, 207:3-22; Besiktas has no records/documentation to support their position that it formally convened the ERT despite the fact that Besiktas' SMS manual requires the ERT to maintain a detailed log of its meetings and activities. The ABP suspects that Limitation Petitioners retroactively declared the situation an "emergency" in an attempt to justify their extreme departure from their own safety policies as well as the applicable international safety regulations. The issue of whether Besiktas considered the situation a legitimate emergency at the time, or convened its ERT, is not material to this Motion.

[20] *See* Ex. F, Deposition of Besiktas (Ozkan), at pp. 70:18-72:17.

[21] *See* Deposition of Besiktas through its representative, Sadik Er, attached hereto as Exhibit "H," at p. 63:10-65:22.

[22] *See* Ex. H, Deposition of Besiktas (Er), at pp. 102:17-106:19.

[23] *Id*.

[24] *Id*.

[25] *See* October 14, 2020 E-mail Correspondence from Capt. Edin to Besiktas, attached hereto as Exhibit "I."

unequivocally stated that the "vessel has no captain."[26] Thereafter, Capt. Edin demanded that Besiktas arrange for him to be removed from the vessel and transported back to Turkey as soon as possible.[27]

Around the same time that Besiktas decided to send Capt. Er to the vessel to oversee the SIRE inspection, it made the decision to hire a new master to replace Capt. Edin.[28] On or about October 14, 2020, Besiktas interviewed and hired Capt. Onur F. Hürmüzlü in Istanbul, Turkey.[29] Immediately after he was hired, Capt. Hürmüzlü was instructed to return to his home in Izmir, Turkey (approximately 400 miles from Besiktas' office), pack his belongings, and return to Istanbul, where he would fly to New Orleans.[30] Capt. Hürmüzlü did as instructed and flew from Istanbul to London, London to Miami, and Miami to New Orleans.[31]  From there, he took a car to Venice, Louisiana where he was transported by launch boat to the ATINA, which was underway in the Mississippi River, and boarded the vessel at 0100 hours.[32] In sum, Capt. Hürmüzlü traveled for over 24 hours before he was instructed to assume command of the vessel. He estimated, however, that between his flights, time needed to travel from Istanbul to his home to pack his belongings, and the time spent traveling from the New Orleans airport to the vessel, he had been awake for approximately 50 hours before boarding the ATINA.[33] He also stated that he was unable to rest during his flights because he was concerned about catching COVID-19 on the plane.[34]

---

[26] *See* Translated and Transcribed Voicemail of Capt. Edin, ATINA 3819-3822, attached hereto as Exhibit "J," with relevant portions highlighted.
[27] *Id.*
[28] *See* Ex. F, Deposition of Besiktas (Ozkan), pp. 70:18-72:17.
[29] *See* Ex. F, Deposition of Besiktas (Ozkan), p. 108:16-19; *see also* October 15, 2020 correspondence from Besiktas to GAC relating to arrangements for a launch boat to transport Capt. Hürmüzlü to the vessel, ATINA 1050, attached hereto as Exhibit "K."  This correspondence further reflects Besiktas' desire to use one launch board to transport Capt. Hürmüzlü to the vessel and Capt. Edin from the vessel.
[30] *See* Ex. D, USCG Interview of Capt. Hürmüzlü, at p. 6:8-19.
[31] *Id.*; *see also* Flight Itinerary of Capt. Hürmüzlü, ATINA 1054, attached hereto as Exhibit "L."
[32] *See* Ex. D, USCG Interview of Capt. Hürmüzlü, at p. 10:23-11:11.
[33] *Id.*, at p. 11:15-12:9.
[34] *Id.*, at p. 6:8-18.

As expected, Capt. Edin departed the vessel shortly after Capt. Hürmüzlü arrived, using the same launch that transported Capt. Hürmüzlü to the vessel.[35] Besiktas knew that Capt. Hürmüzlü would not be given time to rest before taking the helm and further knew that Capt. Edin and Capt. Hürmüzlü would not have had time to fully comply with the company's handover procedure.[36] Moreover, Besiktas knew that, because Capt. Hürmüzlü flew to the vessel the same day that he was interviewed and hired for the captain position, he had not fully completed the company's orientation program.[37] Rather than instructing the vessel to simply remain safely docked at the NuStar facility or to proceed to one of many anchorages on the Mississippi River, Besiktas elected to have Capt. Hürmüzlü assume command of the vessel while it was underway in the Mississippi River and without adequate rest, training, or familiarity with the vessel itself.[38] Besiktas has yet to articulate a reasonable basis for its decision, making it clear that the sole driving factor in its decision-making was financial gain, *i.e.* keeping the vessel in service to prevent the charterer from placing it off-hire. Thus, the entire "emergency" never involved danger to human life or the vessel but, rather, was a commercial emergency, at best.

---

[35] *See* Ex. G, Excerpts of Deck Logs.

[36] Besiktas requires a one day handover period for senior officers already within the company, and at least a seven day period for new senior officers. *See* Section 6.3.13.2 "Overlapping Period" Excerpt from Besiktas Main Manual, attached hereto as Exhibit "M." The local GAC agents working with Besiktas to transport Capt. Hürmüzlü to the vessel specifically raised the issue of whether the exchanged allowed for the necessary handover time. *See* October 16, 2020 Correspondence between the M/T ATINA and GAC, GAC 272, ATINA 1961, attached hereto as Exhibit "N." Additionally, Besiktas arranged travel plans for Capt. Edin to immediately return to Turkey. Thus, it was aware that Capt. Edin would not remain on the vessel long enough to conduct a handover with Capt. Hürmüzlü. *See* Flight Itinerary of Capt. Edin, ATINA 1056-57, attached hereto as Exhibit "O."

[37] Besiktas' training policy was for new masters is designed to last approximately 1 to 1.5 days. Besiktas has produced records which represent that Capt. Hürmüzlü did so. This document is not accurate, however, as Capt. Hürmüzlü was hired and sent to New Orleans on October 15, 2020. *See* Besiktas Training Records, ATINA 2790-2792, attached hereto as Exhibit "P."

[38] AIS data from the MRTIS program also shows that, on the evening of October 16, 2020 through the morning of October 17, 2020, there were over 20 open anchorage spaces available in the Lower Mississippi River below the berth where the M/T ATINA was moored. *See* Report of Capt. Skip Strong, attached hereto as Exhibit "Q" at Section 6.7. Besiktas did not even consider the option of the vessel anchoring at one of these locations for the captain exchange, which, at the very least, would have provided Capt. Hürmüzlü with a place to rest. *See* Ex. F, Deposition of Besiktas, p. 191:6-12.

## 2. The "handover" from Capt. Edin to Capt. Hürmüzlü

Capt. Hürmüzlü boarded the vessel at 0100 hours on October 17, 2020.[39] Shortly thereafter, Capt. Paul Vogt, boarded the vessel to serve as the compulsory pilot through Southwest Pass. Capt. Vogt disembarked at approximately 0342 hours after the vessel had completed its transit through Southwest Pass, leaving Capt. Hürmüzlü at the helm.[40] Before he disembarked, Capt. Vogt notified Capt. Hürmüzlü that the westerly current was "pretty strong."[41] At that time, the vessel's original passage plan called for the vessel to anchor in a location approximately four miles from the Southwest Pass sea buoy.[42] Capt. Hürmüzlü, however, made the decision to anchor the vessel in a different location—one that was only .7 miles from the 57B platform.[43] This positioned the vessel approximately 2.5 nm from the sea buoy. The reason he did this was so that the vessel would be anchored a location that that had good cell phone service.[44] The Limitation Petitioners' liability expert, Capt. David McFarlane, testified that this location was an "unsuitable" due to its proximity of the platform.[45] The ABP's corporate representative, Capt. Michael Miller, a bar pilot with over 30 years of experience, agreed.[46] Thus, the vessel should have never attempted to anchor where it did.

After deploying 5 shots of anchor chain (each shot measuring 90 ft.), Capt. Hürmüzlü received a VHF radio call from the Southwest Pass pilot station.[47] At that time, the vessel was still

---

[39] *See* Excerpt from M/T ATINA Deck Logs dated October 17, 2020, ATINA 2032, attached hereto as Exhibit "R."
[40] *Id.*
[41] See Excerpts of English Translation of M/T ATINA VDR, ABP 218, attached hereto as Exhibit "S," at p. 21.
[42] *See* M/T ATINA Passage Plan dated October 10, 2020, ATINA 41-59, attached hereto as Exhibit "T;" *see also* Figure 3, Page 5 of Report by National Transportation Safety Board ("NTSB") issued November 10, 2021, attached hereto as Exhibit "U." Figure 3 of the NTSB report was generated from the M/T ATINA's VDR data and Google Earth and depicts the original planned anchorage of the vessel, the "actual anchor drop position," the platform, and the sea buoy.
[43] *See* Ex. A, Deposition of Capt. David McFarlane, at p. 71:11-24.
[44] *See* Ex. S, Excerpts of VDR Translation, ABP 237, at p. 30.
[45] *See* Ex. A, Deposition of Capt. David McFarlane, at pp. 133:11-134:11.
[46] *See* Ex. E, Deposition of ABP, at p. 67:23-68:18.
[47] *See* Written Statement of Capt. Hurmuzlu, COX 303, attached hereto as Exhibit "W."

moving at approximately 3 knots.[48] The dispatcher, subsequently identified as Ben Kararick, an employee of MPSI, asked Capt. Hürmüzlü whether he [Capt. Hürmüzlü] intended to travel further into the anchorage. [49] After Capt. Hürmüzlü replied, saying that the vessel was "anchoring," Kararick again requested him to move the vessel to a location at least 4 nm from the sea buoy.[50]

Kararick issued this request after receiving a call from bar pilot, Capt. Bryant Badeaux.[51] Capt. Badeaux, who was piloting an outbound vessel, contacted the Southwest Pass Pilot Station and spoke to Kararick, the on-duty dispatcher. Capt. Badeaux asked Kararick what the M/T ATINA was doing. Kararick interpreted this comment to mean that Capt. Badeaux wanted the vessel to relocate.[52] The reason he did so was that the bar pilots generally prefer to keep a 4 nm "buffer zone" around the sea buoy.[53] This buffer zone allows the pilots space to safely navigate and make lees in the area where they often board and disembark the ships.[54] The Limitation Petitioners' corporate representative of Besiktas, Capt. Sadik Er, agreed that Kararicks' request to the M/T ATINA to relocate was not an "unsafe instruction."[55] This binding admission alone is fatal to the Limitation Petitioners' claims against the ABP.

Capt. Hürmüzlü did not object to Kararick's request, nor did he voice any safety concerns with relocating the vessel.[56] He also gave Kararick no indication that he was fatigued or unfamiliar with the vessel he was operating.[57] Instead, Capt. Hürmüzlü ordered that the vessel heave its anchor so that it could move to another location. In doing so, however, Capt. Hürmüzlü and his

---

[48] *Id*.
[49] *See* Ex. B, Deposition of Ben Kararick, at p. 41:13-16.
[50] *Id*., at p. 65:6-9.
[51] *Id*., at pp. 27:23-28:6.
[52] *See* Ex. B, Deposition of Ben Kararick, at p. 29:20-25.
[53] *Id*., at p. 32:6-16; *see also* Ex. E, Deposition of ABP, at p. 67:3-22.
[54] *See* Ex. B, Deposition of Ben Kararick, at p. 33:8-19; *see also* Ex. E, Deposition of ABP, at p. 67:3-22.
[55] *See* Deposition of Nazim Er, attached hereto as Exhibit "W," at p. 281:1-9.
[56] *See* Ex. B, Deposition of Ben Kararick, at p. 69:15-22.
[57] *Id*.

bridge team failed to account for the wind and current and began dragging the anchor and drifting towards the platform.[58] From there, the crew made a series of dramatic mistakes—including mistaking the platform for a moving ship, losing control of the vessel, and disregarding audible bridge collision alarms—and ultimately struck the platform while moving at a speed of 3.8 kts.[59] The platform was marked on the vessel's Electronic Chart Display and Information System ("ECDIS") and its radar display from the time it began its initial anchoring to the time the allision occurred.[60] The Limitation Petitioners' corporate representatives also testified that Capt. Hürmüzlü and the crew of the M/T ATINA "should have been able to heave the anchor on [the] vessel and put it under power and move if they need[ed] to."[61] This admission is also fatal to the Limitation Petitioners' claims against the ABP.

### 3. *Besiktas' Post-Incident Investigation*

Following the incident, Besiktas conducted a post-incident investigation and issued a Vessel Incident Report.[62] Besiktas concluded that the incident was caused by (1) Inadequate bridge team management, (2) Adverse sea and weather conditions, and (3) Lack of anticipation – inadequate planning and inadequate emergency procedure.[63] However, after the initial report was provided to Besiktas' major oil company customers, Besiktas was instructed to issue supplemental reports that more appropriately addressed the root cause of the incident, specifically, the role

---

[58] *See* Ex. V, Written Statement of Capt. Hurmuzlu.
[59] *See* Ex. S, Excerpts of VDR Translation, ABP 191, 261, at pp. 7, 42.
[60] *See* Screenshot of M/T ATINA Electronic Chart Display and Information System (ECDIS) at time that anchoring commenced (4:06 a.m.), attached hereto as Exhibit "X;" *see also* Ex. T, M/T ATINA Passage Plan dated October 10, 2020, at p. 11.
[61] *See* Deposition of Besiktas through its corporate representative, Olcay Kazal, attached hereto as Exhibit "CC," at p. 78:2-6.
[62] *See* M/T ATINA Original Vessel Incident Report, attached hereto as Exhibit "C-1."
[63] *Id*. at p. 11.

fatigued played in the allision.[64] In response, Besiktas issued two supplemental Incident Reports.[65] Besiktas determined that the root cause of the allision was captain fatigue, in addition to those factors identified in the original report and stated above.[66]

Notably, none of the Besiktas Incident Reports cite the ABP and/or the dispatcher's request for the vessel to move as a "cause" of the incident.[67] This is because Limitation Petitioners did not view any act of the ABP, or Kararick, as being a cause or contributing factor of the incident until a year after this litigation commenced. The Limitation Petitioners, specifically the corporate representatives of Besiktas, have provided binding corporate testimony that no action on the part of the ABP played a part in the accident.[68] Additionally, Limitation Petitioners' own liability experts, Capt. McFarlane and Capt. Betz, have agreed that the ABP played no role in the allision.[69] Finally, Besiktas agreed that the crew should have been able to safely heave the anchor and relocate the vessel without striking the platform, but failed to do so due to their own fault. [70]

As set forth below, Limitation Petitioners cannot carry their burden of proof in this case for several reasons, the most obvious of which is that the ABP and/or the bar pilots' dispatcher did nothing wrong. There is not a single witness, including the Limitation Petitioners' own experts, who attribute the incident to the fact that the dispatcher asked the vessel to move. This is because it is undisputed that the vessel and its crew could have, and should have, been able to safely navigate to a different location without striking the platform. The M/T ATINA crew accepted the dispatcher's request to relocate the vessel without objection and then executed the task in a highly

---

[64] *See* Ex. H, Deposition of Besiktas (Er), at pp. 229:8-230:6; *see also* M/T ATINA Supplemental Vessel Incident Reports, attached hereto as Exhibit "C-2" and Exhibit "C-3."
[65] *Id.*
[66] *Id.* at Section 7.
[67] *See* Ex. C, M/T ATINA Vessel Incident Reports.
[68] *See* Ex. CC, Deposition of Besiktas (Kazal), at pp. 106:9-107:22.
[69] *See* Ex. A, Deposition of MacFarlane, at p. 135:3-7; *see also* Deposition of Capt. John Betz, attached hereto as Exhibit "Y," at 163:13-21.
[70] *See* Ex. CC, Deposition of Besiktas (Kazal), at pp. 77:4 -78:6.

negligent manner. The ABP and the bar pilots' dispatcher, who had no knowledge that the vessel captain had not slept in over 50 hours or that he was working alongside an incompetent bridge team, cannot be held legally liable for the allision.

## LAW AND ARGUMENT

### A.  Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, interrogatory answers, and admissions, together with any affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986). A genuine issue exists if the evidence would allow a reasonable jury to return a verdict for the non-movant. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248, (1986). Although the Court must consider the evidence with all reasonable inferences in the light most favorable to the nonmoving party, the non-movant must produce specific facts to demonstrate that a genuine issue exists for trial. *Webb v. Cardiothoracic Surgery Assocs. of N. Texas*, 139 F.3d 532, 536 (5th Cir.1998). A "material fact" is a fact which, under applicable law, may alter the outcome of the suit. *Anderson v. Liberty Lobby*, 477 U.S. 247, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id*.

### B.  As a matter of law, the ABP cannot be held liable, in part or in whole, for the alleged negligence of its members or their authorized agents.

The ABP is a non-profit limited liability company, the formation of which is statutorily authorized by L.S.A. R.S. 34:1047. The only owner-members of the ABP are the individual bar pilots who are tasked with navigating vessels in and out of Southwest Pass.[71] All of the bar pilots are independent contractors of the ABP, leaving the ABP with no direct employees.[72]  Kararick,

---

[71] *See* Ex. E, Deposition of ABP, at p. 12:13-14:3.
[72] *Id*. at pp. 10:22-11:10.

the dispatcher that asked the M/T ATINA to relocate, was employed by MPSI.[73] At the time of the incident there was a Master Service Agreement in place between the ABP and MPSI pursuant to which MPSI provided dispatchers, such as Kararick, and other services to the bar pilot members of the ABP.[74]

Southwest Pass is a heavily trafficked shipping channel. As a result, the bar pilots must navigate a variety of ships, including cruise ships, cargo ships, and oil tankers, in and out of Southwest Pass, with each job being subject to the weather, river conditions, and ship traffic. The bar pilots typically work two-week shifts, during which time they reside at the ABP facility in Pilottown, Louisiana.[75] While on shift, pilots are expected to navigate ships at any time of the day or night. Given the demanding nature of the bar pilots' job, the ABP was formed to provide the bar pilots with all necessary tools of the trade, such as housing and meals, as well as administrative services to assist with invoicing, insurance, and support needs.[76]

It is well-established rule that pilot associations, like the ABP, are immune from vicarious liability for the torts of their members. *See Guy v. Donald*, 203 U.S. 399, 27 S. Ct. 63, 51 L. Ed. 245 (1906); *Dampskibsselskabet Atalanta A/S v. United States*, 31 F.2d 961, 1929 AMC 855 (5th Cir. 1929); *McKeithen v. S.S. Frosta*, 441 F. Supp. 1213, 1978 AMC 2653 (E.D. La. 1977). *See also Puerto Rico Ports Authority v. M/V Manhattan Prince*, 897 F.2d 1, 1990 AMC 1475 (1st Cir. 1990). This is because pilot associations are not the employers of their members and exercise no control over the pilots while they are performing services for a vessel. *See* § 13:5. Pilots' Associations; 2 Admiralty & Mar. Law § 13:5 (6th ed.). The associations are also not considered partnerships because the members do not function as agents for the association or for each other.

---

[73] *See* Ex. B, at p. 53:7-10.
[74] *See* ABP/MPSI MSA, attached hereto as Exhibit "Z."
[75] *See* Ex. E, Deposition of ABP, at pp. 24:11-25:1.
[76] *Id.*, p. 11:11-22.

*Id*. In sum, pilot associations are not liable for negligently assuring the competence of their members because, as professional associations, they make no guarantee of the professional conduct of their members to the general public. *See McKeithen v. S.S. Frosta*, 441 F. Supp. 1213, 1978 AMC 2653 (E.D. La. 1977).

Limitation Petitioners filed suit against the ABP as the company that "operated, controlled, and manned the Pilots Station.[77]" They seek to hold the ABP liable for the "action, omission, and culpable conduct of [the ABP], including, but not limited to, ordering the M/T ATINA to move from its allegedly safe, secure and proper anchorage position within the confines of the Southwest Pass Anchorage to another location in the Gulf Mexico, with no legal authority or basis to evict the ATINA from its initial anchorage position.[78]" Notably, Limitation Petitioners do not assert any specific claims against individual bar pilots, the dispatcher (Kararick) who issued the subject order, or his employer, MPSI. Instead, Limitation Petitioners seek to hold the ABP – an association of individual bar pilots - liable for the allegedly negligent act of Kararick, a representative of the bar pilots and employee of MPSI.

Because the ABP is an association that does not employ the pilots or the dispatchers, or make any guarantee of their professional conduct, it cannot be held legally liable for the alleged negligent acts of either. As such, Limitation Petitioners claims against the ABP, as well as the tender of ABP to Cox, should be dismissed as a matter of law.

**C.  To the extent a bar pilot or their agent can be held liable, it must be established, by clear and convincing evidence, that their conduct rises to the level of gross negligence.**

To the extent that the Limitation Petitioners somehow attempt to hold the ABP liable for the acts of a member-pilot or his representative, Kararick, the ATINA Interests cannot meet the

---

[77] Rec. Doc. 152, at ¶ 10.
[78] Rec. Doc. 152, at ¶ 16; ¶ 18.

burden of establishing gross negligence by clear and convincing evidence. Thus, the ATINA Interests' claims against the ABP again fail as a matter of law.

The potential liability of bar pilots and their agents is significantly limited by the applicable Louisiana Revised Statutes. "Bar pilots" are defined in LA.R.S. 34:943 as the state commissioned pilots who pilot sea-going vessels into and out of the entrance of the Mississippi River. "Services" of a bar pilot is defined as any advice or assistance **with respect to pilotage** by the commissioned bar pilot or **by his authorized representative**, including but not limited to advice concerning weather, channel conditions, and other navigational conditions.[79]

In connection with the potential liability of a bar pilot and/or a pilots' representative who provides advice concerning weather, channel conditions and "other navigational conditions", there is a heightened burden of proof and limited liability. The pilot, or his authorized representative, can only be held liable for gross negligence:

> Any party seeking to hold a pilot acting under his state commission issued in accordance with this Chapter liable for damages or loss occasioned by the pilot's errors, omissions, fault, or neglect shall be required to prove by clear and convincing evidence that the damages arose from the pilot's gross negligence or willful misconduct.

The ABP acknowledges that Limitation Petitioners have not sued an individual bar pilot, MPSI, or its employee, Ben Kararick, who was acting as an authorized representative of the bar pilots, direct. However, given the case law and statutes regarding an association's immunity from the acts of its members, Limitation Petitioners' only procedurally viable recourse in this case would be to sue MPSI, for the acts of its employee, Kararick, or an individual pilot. Under such a scenario, Limitation Petitioners would be required to show by clear and convincing evidence that either of these potential defendants was grossly negligent. Thus, to the extent Limitation

---

[79] La. R.S. 34:943

Petitioners argue that Kararick's request that the vessel relocate was negligent, it must establish that such negligence rises to the level of gross negligence or willful misconduct. This is because Kararick is an authorized representative of the individual bar pilots.[80] When Kararick radioed the ATINA to ask the vessel what its intentions were, he did so as a representative of Capt. Badeaux. When Kararick then requested the vessel to relocate 4 miles from the sea buoy, he did so pursuant to the bar pilots' standard procedure to provide a 4 nm "buffer zone" around the sea buoy.[81]

It is clear that Kararick, an authorized representative of the bar pilots, gave the instruction on behalf of the individual bar pilots. There is zero evidence of any negligence, much less evidence of gross negligence or intentional wrongdoing. Thus, as a matter of law, Limitation Petitioners' claims – whether made against the ABP, Kararick, MPSI, or an individual bar pilot – fail and should be dismissed with prejudice.

### D. Limitation Petitioners are presumed to be at fault for the subject allision and, under the facts of this case, cannot rebut any of the applicable evidentiary presumptions.

The evidence establishes that the ABP is not at fault for the allision. This is especially true in light of the evidentiary presumptions that apply in this case, both of which place the burden on Limitation Petitioners to show that they are not at fault and that their negligent conduct did not cause the incident.

#### a. Limitation Petitioners are presumed to be at fault pursuant to The Oregon Rule

In determining whether Limitation Petitioners are at fault (whether in part or in whole) and whether their negligence was a contributing factor in the incident, the Court may apply evidentiary presumptions under the general maritime law. "Liability for collisions on the navigable waters is governed by a series of presumptions and burden-shifting principles." *N.D. Shipping, S.A. v.*

---

[80] *Id.*
[81] *See* Ex. B, Deposition of Ben Kararick, at p. 32:6-16; *see also* Ex. E, Deposition of ABP, at p. 67:3-22.

*ZAGORA M/V*, No. CIV.A.06-10734, 2009 WL 1606877, at *5 (E.D. La. June 5, 2009) (citing

*Illinois Constructors Corp. v. Logan Transp., Inc.,* 715 F.Supp.2d 872, 879 (N.D.Ill.1989)).

Specifically, the Court may apply the evidentiary presumptions set forth in the *Oregon* Rule and

the *Pennsylvania* Rule, the application of which results in a rebuttable presumption that Limitation

Petitioners are at fault for the allision and that their negligence caused the allision to occur.

A moving vessel that strikes a stationary object, such as an offshore platform, is presumed

to be at fault for a maritime allision. *The Oregon*, 158 U.S. 186 (1895); See also *Bunge Corp. v.*

*M/V Furness Bridge*, 588 F.2d 790, 794 (5th Cir. 1977); *Chevron Oil Co. v. M/V NEW*

*YORKER,* 297 F.Supp. 412 (E.D.La.1969).[82] The Fifth Circuit has consistently applied this

presumption in allision cases, placing the burden of producing evidence and the burden of

persuasion onto the moving vessel." *American Petrofina Pipeline Co. v. M/V SHOKO MARU*, 837

F.2d 1324, 1326 (5th Cir. 1988) (internal citations omitted). To rebut this presumption, the vessel

much show that the incident was the fault of the stationary object, that it acted with reasonable

care, or that the allision was an unavoidable accident. *Id*.

Limitation Petitioners have not alleged, and cannot show, that the incident was caused in

any way by the SP 57-B platform or that it was an unavoidable accident. It is undisputed that the

platform was well lit, appeared on the vessel's radar, and was, in fact, noted as a way point in the

M/T ATINA's passage plan.[83]

Finally, given Limitation Petitioners' conduct in the days leading up to the incident, they

cannot show that they exercised reasonable care in responding to the commercial emergency

created by Capt. Edin's resignation; violating their own internal policies and procedures as well as

---

[82] The *Oregon* Rule applies to the vessel, its operator, and all parties participating in its management. *Woods v. United States Department of Transportation*, 681 F.2d 988 (5th Cir. 1982); *Portland Pipeline Corp. v. M/V BARCOLA*, 1982 AMC 2725, 2731-32 (D. Me. 1982).
[83] *See* Ex. X, ECDIS Screenshot; *see also* Ex. T, M/T ATINA Passage Plan dated October 10, 2020.

U.S. and international laws concerning rest hours, captain training and handover of the vessel; violating international and U.S. regulations; and refusing to allow the vessel to remain at the NuStar facility or another anchorage on the river so that a proper handover with a well-rested captain could be accomplished. Limitation Petitioners decisions and behavior are objectively unreasonable, and negligent.

This same is true for Capt. Hürmüzlü, and the vessel's bridge team, who collectively failed to exercise reasonable care in navigating the vessel. Limitation Petitioners have consistently taken the position that Capt. Hürmüzlü was not fatigued and that the incident was the result of negligence on the part of the bridge team, who incorrectly advised Capt. Hürmüzlü that the platform was a ship. Accepting Limitation Petitioners' version of events as true, the fact remains that the crew of the M/T ATINA struck a stationary platform that was marked on charts, visible on the vessel's radar and marked on the vessel's passage plan. Accordingly, Limitation Petitioners are presumed to be at fault for the subject allision. Limitation Petitioners cannot produce any evidence in support of their claim that the ABP played any role in causing the allision, and thus, cannot rebut the presumption that they are at fault under the *Oregon* rule.

> b. *Limitation Petitioners' violation of applicable safety regulations are presumed to have caused the incident under the Pennsylvania Rule.*

The *Pennsylvania* Rule provides that a party who violates a statutory rule intended to prevent maritime accidents is *presumed to have caused the accident*. *See Pennzoil Producing Co. v. Offshore Express, Inc.*, 943 F.2d 1465, 1472 (5th Cir. 1991) (emphasis added); *see also Candies Towing Co. v. M/V B & C Eserman*, 673 F.2d 91, 93 (5th Cir. 1982); *Brunet v. United Gas Pipeline Co.,* 15 F.3d 500, 504 (5th Cir. 1994) (the *Pennsylvania* Rule "constitutes an evidentiary rule reversing the burden of proof."). This presumption of fault can be rebutted only if the vessel can prove *not only* that the violation was not a cause of the accident but that the violation "*could not*

18

*have been*" a cause of the accident. *The Pennsylvania*, 86 U.S. 125, 136, 19 Wall. 125, 22 L.Ed. 148 (1874) (emphasis added); *See also Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 364 (5th Cir. 2006) (citing *The Pennsylvania*, 86 U.S. (19 Wall.) 125, 136, 22 L.Ed. 148 (1873)). It is undisputed that Limitation Petitioners' conduct violated several safety rules and regulations, including those promulgated by the International Maritime Organization ("IMO") guidelines for compliance with the Safety of Life at Sea ("SOLAS") regulations, which has been ratified by Malta (the flag state of the vessel), Turkey, and the United States.

For example, SOLAS Regulation 34 "Safe Navigation and avoidance of dangerous situations" requires a master to ensure that the intended voyage plan has been issued.[84] SOLAS Chapter 5, Annex 23 expands on this provision and references IMO Resolution A.893 (21), which provides that the vessel should have a competent and well-rested crew. Here, while the ATINA had a proper voyage plan, Capt. Hurmuzlu departed from that plan for no reason other than, at the selected anchorage, he had good cell phone service. It is undisputed that Capt. Hürmüzlü failed to follow the passage plan that had been drafted prior to the vessel leaving the NuStar facility. It is further undisputed that Limitation Petitioners knew that conducting a simultaneous captain changeover would not allow Capt. Hürmüzlü sufficient time to review the passage plan, nor would it allow him to be well-rested.

Additionally, Limitation Petitioners violated 46 C.F.R. 15.1111 "Work hours and Rest Periods," which requires vessel captains to have 10 hours of rest in any 24-hour period and 33 C.F.R. 164.11 "Navigation under way: General," which provides that each crew member must be competent to perform their respective duties. Limitation Petitioners will likely argue that issues of

---

[84] *See* SOLAS – International Convention for the Safety of Life at Sea, Ch. 5, Reg. 34 – "Safe navigation and avoidance of dangerous situations," excerpt attached hereto as Exhibit "AA," with relevant portions highlighted.

fact exist as to whether Capt. Hürmüzlü slept on any of his flights from Istanbul to New Orleans. They will also argue that regulations relating to fatigue do not require "sleep," but instead require only "rest." These arguments are without merit. There is no issue of fact as to whether Capt. Hürmüzlü was well-rested at the time he took control of the vessel. Capt. Hürmüzlü told the United States Coast Guard that he had not slept in over 50 hours when he boarded the vessel.[85] He further told the United States Coast Guard that he was unable to sleep on the plane due to his concerns about contracting COVID.[86]

Limitation Petitioners may also attempt to argue that they were not required to comply with the subject rules and regulations because they were dealing with an "emergency situation." This argument is astounding, especially given the fact that the "emergency" of needing to quickly replace Capt. Edin did not present a risk to life, property, or the environment but instead threatened Limitation Petitioners' ability to profit from the use of the M/T ATINA. The only "emergency" in this case was the situation under which Capt. Hürmüzlü was made to assume command of the vessel, a situation that was created and orchestrated by Limitation Petitioners in their effort to keep the vessel on charter and earning money. Moreover, the fact that Limitation Petitioners were dealing with that they deemed to be an "emergency situation" does not change the fact that they knowingly violated safety regulations designed to prevent the exact type of incident at issue in this case, thereby triggering the application of the *Pennsylvania* Rule.

### E.  Limitation Petitioners' negligence claims against the ABP fail as a matter of law.

#### a.   *ABP did not owe or breach a duty to Limitation Petitioners*

Setting aside the statutory limited liability of the bar pilots and their representatives set out above, Limitation Petitioners' claims against the ABP are governed by the principles of the general

---

[85] *See* Ex. D, USCG Interview of Capt. Hurmuzlu, at pp. 11-12.
[86] *Id.*

maritime law. Like an ordinary negligence claim, to succeed on a negligence claim in admiralty, the plaintiff must prove that: (1) the defendant owed a duty to the plaintiff; (2) the defendant breached that duty; (3) the breach actually and proximately caused the plaintiff's injury; and (4) the plaintiff sustained an injury. *In re Great Lakes Dredge & Dock Co*. LLC, 624 F.3d 201, 211 (5th Cir. 2010). Petitioners' claims fail with respect to elements (1) through (3).

In determining the scope of the duty owed in a maritime negligence claim, the U.S. Fifth Circuit has held that courts must consider the foreseeability of the harm suffered by the complaining party, such that a "[d]uty may be owed only with respect to the interest that is foreseeably jeopardized by the negligent conduct.'" *SCF Waxler Marine LLC*, 427 F. Supp. 3d at 758 (citing *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1253 (11th Cir. 2014); *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 211 (5th Cir. 2010)). In other words, a duty is owed "if harm of a general sort to persons of a general class might have been anticipated by a reasonably thoughtful person, as a probable result of the act or omission, considering the interplay of natural forces and likely human intervention." *Id*. at 759 (quoting *In re Great Lakes Dredge*, 624 F.3d at 211); see also *Consol. Aluminum Corp. v. C.F. Bean Corp.*, 833 F.2d 65, 68 (5th Cir. 1987).

Here, there is no evidence that the ABP owed or breached a duty to Limitation Petitioners as it relates to the subject allision. It is undisputed that the incident did not occur while a bar pilot was onboard and navigating the vessel. There is no evidence to support an argument that the ABP or Kararick could have foreseen the negligent conduct of Limitation Petitioners or that they had any indication that Capt. Hürmüzlü was sleep deprived or otherwise incapable of properly navigating his vessel. Similarly, the ABP nor Kararick had any information that could have led them to suspect that Capt. Hürmüzlü had been awake for over 50 hours, or that the M/T ATINA

crew would mistake the platform for a moving vessel, fail to observe the platform on the vessel's radar, and disregard bridge alarms alerting them to the platform's location and the collision course the vessel was on.

As to Limitation Petitioners' position that the ABP had no legal basis or authority to ask the vessel to move, the ABP submits that the request, in and of itself, was not inherently dangerous or negligent in any way. In that regard, Limitation Petitioners cannot cite to any case law, statute, or U.S. Coast Guard regulation that supports their position that the ABP was not permitted to issue such a request. This position is supported by the opinions and testimony of Limitation Petitioners' own expert.[87]

Specifically, Capt. David McFarlane testified that it was "completely within [the ABP's] prerogative to suggest that it's not the correct place to be and to move elsewhere.[88]" He further testified that any competent vessel master should have been able to relocate the M/T ATINA without striking the platform.[89] He instead attributes the incident to the fault of the M/T ATINA crew, particularly their distraction, poor situational awareness, and lack of bridge team management.[90] As to the ABP and its dispatcher, Capt. McFarlane testified that they "absolutely did not" play a role in the incident and that he didn't "see any causation caused by the pilots themselves.[91]" Notably, Capt. MacFarlane agreed that the vessel's initial anchoring location was not safe given how close it was to the platform.[92]

In sum, any argument that the ABP owed the duty to avoid issuing making requests to the M/T ATINA, including requests that an otherwise competent crew and captain should be able

---

[87] *See* Ex. A, Deposition of Dave McFarlane.
[88] *See* Ex. A, Deposition of Dave McFarlane, at p. 132:15-22.
[89] *Id.*, at p. 133:4-10.
[90] *Id.*, at p. 134:20-24.
[91] *Id.*, at p. 135:1-21.
[92] *Id.*, 133:17-134:11.

execute without issue, is without merit. Moreover, even if the request was unsafe (which is denied), Limitation Petitioners had the duty to object, and decline to follow that request.  This is because a captain is the master of the vessel he drives, meaning he has ultimate say in matters of navigation. *See SCF Waxler Marine LLC v. M/V ARIS T*, 427 F. Supp. 3d 728, 768 (E.D. La. 2019*), aff'd sub nom., SCF Waxler Marine, L.L.C. v. Aris T M/V*, 24 F.4th 458 (5th Cir. 2022).  A captain's duty to his vessel and those around him are not modified by direct command or request by a communicating dispatcher. *Id.*  This is consistent with the Besiktas SMS manual which provides that the Master has overriding authority.[93] The ABP was not privy to Limitation Petitioners' internal decision making and had no knowledge, or reason to suspect, that the M/T ATINA was rendered grossly unseaworthy by its incompetent captain and crew and would navigate directly into the nearby platform.

> b.  *The allision was caused by the Limitation Petitioners' negligence, not the ABP's request that the vessel relocate.*

Petitioners' claims against the ABP also fail because any purported breach of a duty by the ABP did not legally cause the incident. The U.S. Firth Circuit has made clear that "[u]nder the general maritime law, a party's negligence is actionable only if it is the 'legal cause' of the plaintiff's injuries, which is "something more than 'but for' causation — the negligence must be a substantial factor in causing the injuries." *In re Great Lakes Dredge & Dock Co. LLC*, 624 F.3d at 213–14 (quoting *Donaghey v. Ocean Drilling & Explor. Co.*, 974 F.2d 646, 649 (5th Cir.1992)). "[F]ault which produces liability must be a contributory and proximate cause of the collision, and not merely fault in the abstract." *Bd. of Comm'rs of Port of New Orleans v. M/V FARMSUM*, 574

---

[93] *See* Besiktas Main Manual, Section 5.1, "Statement of Master's Overriding Authority," attached hereto as Exhibit "BB."

F.2d 289, 297 (5th Cir. 1978); See also *Am. River Transp. Co. v. Kavo Kaliakra* SS, 148 F.3d 446, 450 (5th Cir. 1998) (citation omitted).

Related to the lack of proximate cause on the part of the ABP, is the doctrine of superseding cause, which the U.S. Supreme Court has recognized applies in admiralty cases. *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 832 (1996). While the ABP denies that its actions substantially contributed to the allision, the doctrine of superseding cause applies where "the injury was actually brought about by a later cause of independent origin that was not foreseeable." *Id*. at 837. This doctrine is predicated on the notion that "there must be a terminus somewhere, short of eternity, at which the second party becomes responsible in lieu of the first." *See Stolt Achievement, Ltd. v. Dredge B.E. LINDHOLM*, 447 F.3d 360, 368 (5th Cir. 2006).

The Fifth Circuit has employed the following factors in determining whether the intervening act of a third party rises to the level of a superseding cause. An intervening act is not a superseding cause if:

> (a) the actor at the time of his negligent conduct should have realized that a third person might so act, or

> (b) a reasonable man knowing the situation existing when the act of the third person was done would not regard it as highly extraordinary that the third person had so acted, or

> (c) the intervening act is a normal consequence of a situation created by the actor's conduct and the manner in which it is done is not extraordinarily negligent.

*See Donaghey v. Ocean Drilling & Expl. Co.*, 974 F.2d 646, 652 (5th Cir. 1992); See also *Matter of Lasala*, No. CV 18-11057, 2022 WL 17485951, at *14 (E.D. La. Dec. 7, 2022). While Courts have been reluctant to determine legal causation on summary judgment, issues regarding the application of the superseding cause doctrine are appropriate for summary judgment where the uncontroverted facts and inferences to be drawn from those facts permit reasonable minds to reach only one conclusion. *Consolidated Grain & Barge Co., Inc. v. Capital Marine Supply, Inc.*, No.

99-0813, 2001 WL 128307 (E.D. La. Feb. 14, 2001); *Clark v. Morrison*, No. 08-4253, 2009 WL 3254149 (E.D. La. Oct. 7, 2009); *Trias Maritime Co., Ltd. of Liberia v. Great Lakes Towing, Co.*, 97-C-5202, 2001 WL 1359856 (N.D. Ill. Nov. 2, 2001); *Dixon v. Greyhound Lines, Inc.*, 3:13-cv-00179, 2014 WL 4627282 (M.D. La. Sept. 16, 2014).

Louisiana courts applying general maritime law have embraced this concept. Particularly, in *Shofstahl v. Board of Commissioners of Orleans Levee District,* 02-0018 (La. App. 4 Cir. 1/15/03), 841 So. 2d 1, *writ denied*, 03-1387 (La. 9/26/03), 854 So. 2d 368, the court found plaintiffs liable under the general maritime law for an allision between the plaintiffs' vessel and unlit pier that protruded 420 feet into Lake Ponchartrain and was properly permitted by the U.S. Army Corps of Engineers. The Louisiana Fourth Circuit affirmed the judgment of the district court granting defendants' Motion for Summary Judgment, finding that "proximate causation cuts off liability for a cause in fact under general maritime law." *Id*. at 1. The court concluded that plaintiffs' "navigational negligence was the sole proximate cause of an allision and/or the superseding cause." *Id*. at 10. In reaching this conclusion, the court reasoned that "[w]hile the defendants' unlit pier may be a cause in fact of plaintiffs' injuries, cause in fact liability is not sufficient to justify recovery using negligence principles of general maritime law." *Id.* at 9. The court referenced its opinion rendered in *Sutton v. Duplessis*, 584 So. 2d 362 (La. App. 4th Cir. 1991), which held: "[n]egligence is actionable only where it is both a cause in fact and a legal cause of the injury. Legal cause requires a proximate relation between the actions of a defendant and that harm which occurs, and such relation must be substantial in character." *Sinitiere v. Lavergne,* 391 So. 2d 821 (La. 1980).

The ABP did not cause this incident. The incident was caused by a sleep-deprived captain assuming control of a vessel on which he had never set foot and the fact that he relied on incorrect

information provided from his bridge despite having a functioning radar and bridge alarms notifying him that such information was incorrect. Limitation Petitioners' argument is essentially "but-for the ABP's instruction, the vessel would have remained stationary and not struck the platform:"

> Q: Why did Besiktas sue the Associated Branch Pilots of the Port of New Orleans?
>
> A: Because the vessel was safely anchored. And after the instruction was received from the pilot station, the vessel lost control and was involved in an accident.
>
> Q: Okay.
>
> A: Maybe if they had let the vessel stay in that anchored position, this allision or the accident would never have happened.[94]

This type of "but-for" causation is insufficient to carry a negligence claim under the general maritime law. However, assuming for the purposes of this motion only, that the ABP and/or its dispatcher's order that the vessel to relocate was a contributing factor in the allision (which is denied), the negligent conduct of Capt. Hürmüzlü and his bridge team rise to the level of a superseding cause of the incident. The ABP had no knowledge or reason to believe that Capt. Hürmüzlü had been awake for over 50 hours at the time he took command of the vessel. Additionally, the conduct of Capt. Hürmüzlü and the bridge team was extraordinary negligent and does not fall within conduct that anyone, much less the ABP or Kararick, should have, or could have, reasonably anticipated.

## CONCLUSION

The ABP is not vicariously liable for the alleged negligent acts of its members or agents. Thus, Limitation Petitioners' attempt to hold the ABP liable for the alleged negligence of the

---

[94] Ex. H, Deposition of Besiktas (Er), at p. 291: 3-12.

"Southwest Pilots Station," dispatcher, Ben Kararick, an employee of MPSI, or any of the bar pilots involved with the navigation of the M/T ATINA fail as a matter of law. This reason, standing alone, is sufficient to warrant dismissal of the Limitation Petitioners' claims.

Moreover, the ABP cannot be deemed to have caused or contributed to the allision solely by virtue of the fact that it asked the M/T ATINA to move to an anchorage location more than 4 miles from the sea buoy. The crew of the M/T ATINA was, or should have been, well aware of the 57B platform's presence, yet failed to properly navigate the vessel to avoid impact. Under these facts, the Limitation Petitioners cannot meet their burden under the general maritime law, which requires a showing of the specific action or inaction on the part of the ABP that was a substantial factor in causing the allision. By all accounts, including the Limitation Petitioners' own corporate representatives and liability experts, the ATINA should have easily cleared the platform had it been properly navigated. Accordingly, the ABP submits that there are no genuine issues of fact precluding summary judgment dismissal of all claims made against it, and tendered to Cox, by Limitation Petitioners.

[signature block on the following page]

Respectfully submitted,

*/s/   Jacques P. DeGruy*
Robert R. Johnston, T.A. (#22442)
Jacques P. DeGruy (#29144)
Constance C. Waguespack (#36416)
Courtney E. Crowell (#38708)
**PUSATERI, JOHNSTON, GUILLOT &**
**GREENBAUM, LLC**
1100 Poydras Street, Suite 2250
New Orleans, Louisiana 70163
Telephone: (504) 620-2500
Facsimile: (504) 620-2510
Robert.Johnston@pjgglaw.com
Jacques.DeGruy@pjgglaw.com
Constance.Waguespack@pjgglaw.com
Courtney.Crowell@pjgglaw.com
**Attorneys for Associated Branch Pilots of the**
**Port of New Orleans, LLC**