UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **COX OPERATING, LLC** | **CIVIL ACTION** |
| **VERSUS** | **NO: 20-2845**<br>**c/w 20-2871** |
| **ATINA M/V ET AL.** | **SECTION "H"** |

## ORDER AND REASONS

Before the Court are Cross-Partial Motions for Summary Judgment on the issue of punitive damages (Docs. 264, 273, 274). For the following reasons, Cox Operating, LLC, Energy XXI GOM, LLC, and EPL Oil & Gas, LLC's Partial Motion for Summary Judgment is **DENIED**; Petitioners Atina Maritime Ltd., Besiktas Likid Tasimacilik Denizcilik Ticaret A.S., and Ciner Ship Management's Partial Motion for Summary Judgment is **GRANTED**; and Petitioner Atina Maritime Limited's Partial Motion for Summary Judgment is **GRANTED**.

## BACKGROUND

This action arises out of an allision between the M/V ATINA and the SP 57B offshore platform. At the time of the allision, Atina Maritime Ltd. ("Atina") was the bareboat charterer of the M/V ATINA. Besiktas Likid Tasimacilik

1

Denizcilik Ticaret A.S. ("Besiktas") was the crew and technical manager of the M/V ATINA and employed its master and crew. Ciner Ship Management ("Ciner Ship") was the commercial manager for the M/V ATINA. In this action, Cox Operating, LLC, Energy XXI GOM, LLC, and EPL Oil & Gas, LLC (collectively "Claimants") bring general maritime negligence and punitive damages claims against Atina, Besiktas, and Ciner Ship for damages sustained by the SP 57B platform.[1] In response, Atina, Besiktas, and Ciner Ship (collectively "Petitioners") filed a Limitation of Liability action.[2] The two matters were consolidated before this Court. Petitioners have also brought a third-party demand against the Associated Branch Pilots of New Orleans ("the ABP") and tendered the ABP to Claimants, alleging that the ABP's dispatcher was negligent in ordering the M/V ATINA to move just before the allision.

The relevant, undisputed facts are as follows. In October 2020, Captain Ayhan Edin was at the helm of the M/V ATINA in the Mississippi River when he began acting erratically and sending threatening messages to Besiktas's office in Istanbul, Turkey. In response, Besiktas established an Emergency Response Team ("ERT"). The ERT arranged for superintendent Captain Sadik Nazim Er to board the vessel while it was docked at the Nustar Terminal. Captain Er was prepared to take over as captain of the vessel if necessary. The ERT also began looking for a qualified master to replace Captain Edin if necessary. After observing the situation, Captain Er recommended replacing Captain Edin, and Captain Edin resigned shortly thereafter. A local agent then advised Captain Er that he could not sail with the vessel because of his visa

---

[1] Claimants also brought claims against Hanzhou 1 Ltd., as owner of the M/V ATINA, but this Court dismissed those claims on summary judgment (Doc. 334).

[2] Case No. 20-2871.

2

status. Thereafter, Besiktas hired Captain Onur Hurmuzlu, a licensed tanker master with the appropriate U.S. visa, and immediately flew him from Istanbul to New Orleans to take over as captain of the ATINA. Because of the exigent situation, Hurmuzlu did not perform any of the usual company training.

After it unloaded its cargo at the Nustar Terminal, the ATINA departed for the Southwest Pass Anchorage. Although he had resigned, Captain Edin remained at the helm along with a river boat pilot. Besiktas initially planned to perform the master exchange after the vessel was anchored at the Southwest Pass Anchorage—having the same launch boat bring Hurmuzlu and take Edin. The parties dispute at what point this plan changed. However, Besiktas ultimately agreed—either because of the weather or because of Captain Edin's demands to get off the vessel—to perform the exchange while the vessel was underway in the Mississippi River.

Meanwhile, Hurmuzlu was traveling from Istanbul to London to Miami to New Orleans and then to Venice, Louisiana—a travel time of more than 24 hours. He boarded the ATINA in the early morning hours of October 17, 2020 while the vessel was in the Mississippi River en route to the Southwest Pass Anchorage. Hurmuzlu admitted that he had not slept in 52 hours when he took the helm of the ATINA.

Captain Edin departed on the boat that brought Captain Hurmuzlu, so the chief officer on the vessel performed a brief handover. The handover was significantly shorter than the 7-day overlap contemplated by Besiktas Safety Manual for senior officers new to the company. The handover also did not comply with the requirement in Besiktas Safety Manual that joining seafarers

3

traveling for more than 12 hours should take up duties the following day. Claimants allege that the handover also violated other applicable regulations governing the minimum amount of rest required for a vessel master.

With Hurmuzlu serving as captain, the vessel proceeded downriver until it reached the Southwest Pass Anchorage and dropped off the river boat pilot. It then began to anchor within the bounds of the Anchorage, within 0.7 miles of the SP 57B Platform. In anchoring in this location, Captain Hurmuzlu did not follow the vessel's original passage plan but chose to anchor in a spot he felt would have the best cell phone reception. After dropping anchor but before it was set, a dispatcher with the ABP requested that the vessel relocate to a different position because the ABP preferred to keep a 4-mile buffer zone around the sea buoy. Captain Hurmuzlu obeyed and began to heave the anchor. While trying to move the vessel to comply with the dispatcher's order, the ATINA allied with Claimants' platform. Petitioners allege that the accident was a result of a mistake made by Captain Hurmuzlu's second officer who mistook the platform for a vessel and misinformed him regarding its distance. A transcript of the conversation between Hurmuzlu and his second officer in the bridge prior to the accident evinces a collective confusion regarding whether the platform was moving and, if so, in what direction and at what speed.

After the allision, Besiktas prepared three different incident reports with three different root cause analyses. The first blamed the accident on the navigational errors of the bridge team. Then, at the insistence of its customers, it prepared a second report naming ineffective training and improper recruitment as root causes. Finally, after further pressure from other

4

customers regarding discrepancies between its incident report and a report prepared by the National Transportation Safety Board, it prepared a third report in which it identified fatigue as a root cause. Besiktas contends that it only issued the second and third reports at the insistence of its customers and that it believes fatigue and training were not causes of the accident.

Now before the Court are three summary judgment motions on the issue of punitive damages. In the first, Claimants move for a partial summary judgment against all Petitioners finding that punitive damages are warranted. In a cross-motion, Petitioners move for dismissal of the punitive damage claims, arguing that the facts do not support such a claim. In the third, Atina moves for a partial summary judgment dismissal of the punitive damage claims against it because Claimants have not presented evidence of any outrageous actions taken specifically by it.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."[3] A genuine issue of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[4]

In determining whether the movant is entitled to summary judgment, the Court views facts in the light most favorable to the non-movant and draws

---

[3] Sherman v. Hallbauer, 455 F.2d 1236, 1241 (5th Cir. 1972).
[4] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

all reasonable inferences in his favor.[5] "If the moving party meets the initial burden of showing that there is no genuine issue of material fact, the burden shifts to the non-moving party to produce evidence or designate specific facts showing the existence of a genuine issue for trial."[6] Summary judgment is appropriate if the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case."[7] "In response to a properly supported motion for summary judgment, the non-movant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, and such evidence must be sufficient to sustain a finding in favor of the non-movant on all issues as to which the non-movant would bear the burden of proof at trial."[8] "We do not . . . in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[9] Additionally, "[t]he mere argued existence of a factual dispute will not defeat an otherwise properly supported motion."[10]

## **LAW AND ANALYSIS**

Claimants' claims for punitive damages arise under general maritime law. Under general maritime law, punitive damages may be available if the plaintiff proves that the defendant's behavior was "so egregious as to constitute gross negligence, reckless or callous disregard for the rights of others, or actual

---

[5] Coleman v. Houston Indep. Sch. Dist., 113 F.3d 528, 532 (5th Cir. 1997).
[6] Engstrom v. First Nat'l Bank of Eagle Lake, 47 F.3d 1459, 1462 (5th Cir. 1995).
[7] Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).
[8] John v. Deep E. Tex. Reg. Narcotics Trafficking Task Force, 379 F.3d 293, 301 (5th Cir. 2004) (internal citations omitted).
[9] Badon v. R J R Nabisco, Inc., 224 F.3d 382, 394 (5th Cir. 2000) (quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)).
[10] Boudreaux v. Banctec, Inc., 366 F. Supp. 2d 425, 430 (E.D. La. 2005).

6

malice or criminal indifference."[11] The Supreme Court has advised that "[p]unitive damages are limited to cases of 'enormity,' that is, where a defendant's conduct is outrageous, owing to gross negligence, willful, wanton, and reckless indifference for others' rights, or even more deplorable conduct."[12] "The theory of a punitive damage award is that the defendant has committed the civil equivalent of a crime."[13] Further, to hold a company responsible for those egregious acts, "the conduct must emanate from corporate policy or that a corporate official with policy-making authority participated in, approved of, or subsequently ratified the egregious conduct."[14]

The quintessential case for the award of punitive damages is *Exxon Shipping Co. v. Baker*, in which the evidence showed that Exxon failed to monitor its captain who had returned to duty after dropping out of treatment for alcoholism and was aware that he had relapsed back into his former drinking habits.[15] The captain was intoxicated when he inexplicably abandoned his post "on the bridge of the 900-foot oil tanker two minutes before a critical turn to avoid a reef, even though he was the only person onboard the

---

[11] Gonzalez v. Sea Fox Boat Co. Inc., 582 F. Supp. 3d 378, 381 (W.D. La. 2022).
[12] Exxon Shipping Co. v. Baker, 554 U.S. 471, 492.
[13] Matter of Crosby Marine Transportation, L.L.C., No. CV 17-14023, 2021 WL 1931168, at *4 (E.D. La. May 13, 2021).
[14] In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010, 21 F. Supp. 3d 657, 749 (E.D. La. 2014).
[15] *Exxon Shipping Co.*, 554 U.S. at 476.

ship licensed to navigate this part of the Prince William Sound."[16] The resulting grounding caused an 11-million gallon oil spill.[17]

Claimants argue that Petitioners' conduct is sufficiently outrageous to warrant the imposition of punitive damages here. Claimants contend that Petitioners were unwilling to anchor the M/V ATINA to allow time for proper training, rest, and handover of captains because such would require putting the vessel off-hire and they would lose money. Instead, Claimants argue, Petitioners failed to perform training or follow their own handover procedures and allowed a sleep-deprived captain to take the helm of the vessel in the middle of the river at night. Claimants argue that Captain Hurmuzlu's fatigue caused him to lose situational awareness and mistake the platform for a vessel. Claimants point to Petitioners' post-allision acts, including allegedly lying in their incident reports to appease customers and falsifying the length of the handover in their records, as evidence of their egregious conduct. Claimants further allege that the members of the ERT who arranged the master exchange were corporate officials with policy-making authority such that Petitioners can be liable for their outrageous conduct.

On the other hand, Petitioners paint a very different picture. Petitioners assert that they did the best they could during a difficult, emergency situation.

> Besiktas' management took the developing situation with the ATINA very seriously, convening the Emergency Response Team; dispatching Superintendent Er to the vessel on the first available flight; exploring various options for replacing Capt. Edin and ultimately recruiting a qualified Turkish master replacement with the requisite U.S. visa and transporting him to the vessel as

---

[16] *Matter of Crosby Marine Transportation, L.L.C.*, 2021 WL 1931168, at *4 (discussing *Exxon Shipping Co.*, 554 U.S. at 476).

[17] *Exxon Shipping Co.*, 554 U.S. at 476.

>   quickly as possible; and otherwise managing a fluid situation developing thousands of miles from its office.[18]

Petitioners point out that there is no evidence that the captain was fatigued or that they were motivated by money. Further, they argue that lack of training, insufficient handover, and fatigue were not causes of the allision. Instead, they contend that the evidence reveals that the root cause of the accident was the mistaken identity of the platform.

The Court acknowledges that there are issues of fact regarding whether fatigue or inadequate handover and training procedures were causes of the allision. Even assuming, however, that these factors contributed to the allision, this Court does not find Petitioners' conduct to be sufficiently outrageous to warrant punitive damages. There is no evidence that Petitioners "engage[d] in a pattern of such violations as would demonstrate a callous disregard for others' rights."[19] Instead, the evidence shows that Petitioners responded quickly to the situation regarding Captain Edin and explored several avenues for resolution. While it is undisputed that the ERT arranged Hurmuzlu's travel and the mid-river master exchange, there is no evidence that any corporate official knew that Hurmuzlu was fatigued or that he had not slept for 52 hours. Indeed, the evidence shows that even those aboard the vessel were not concerned about Hurmuzlu's fatigue or ability to serve as master.[20] Further, the ERT knew that Hurmuzlu would be assisted by a river boat pilot, a second

---

[18] Doc. 275 at 18.
[19] *Matter of Crosby Marine Transportation, L.L.C.*, 2021 WL 1931168, at *5.
[20] Chief Officer Serhan Atac testified that Captain Hurmuzlu did not seem tired and he had no concerns about his ability to command the vessel. Doc. 275-2 at 15–18. River Boat Pilot Paul Vogt testified that Captain Hurmuzlu appeared awake and did not do or say anything that made him question his competency as a master. Doc 275-2 at 250–53.

officer, and a chief officer in navigating the ATINA to an anchorage location. Therefore, there was no reason for Petitioners to believe that placing Hurmuzlu at the helm of the ATINA created a risk to others. Even assuming that the ERT should have, as Claimants allege, anchored the vessel at the Nustar Terminal to await Hurmuzlu, allow him to rest, and comply with their training and handover guidelines, these failures do not amount to "the civil equivalent of a crime or the kind of reprehensible culpability involved in *Exxon Shipping*."[21] Finally, there is no evidence beyond pure conjecture that Petitioners' actions were motivated by money or a desire not to put the ship off-hire. Accordingly, this Court finds that even taking the facts in a light most favorable to Claimants, no reasonable trier of fact could award punitive damages. Claimants' punitive damages claims against all Petitioners must be dismissed.[22]

## CONCLUSION

For the foregoing reasons, Cox Operating, LLC, Energy XXI GOM, LLC, and EPL Oil & Gas, LLC's Partial Motion for Summary Judgment is **DENIED**; Petitioners Atina Maritime Ltd., Besiktas Likid Tasimacilik Denizcilik Ticaret A.S., and Ciner Ship Management's Partial Motion for Summary Judgment is

---

[21] *Matter of Crosby Marine Transportation, L.L.C.*, 2021 WL 1931168, at *5.
[22] Although it need not reach the arguments set forth by Atina in its separate Motion (Doc. 273), the Court notes that those arguments also have merit. Claimants do not allege that Atina took any egregious actions. Instead, they argue that Atina should be liable because it had privity and knowledge of Besiktas's actions. All of the cases that Claimants cite, however, address a shipowner's privity and knowledge when considering the limitation of liability. Claimants do not cite any case that suggests that a shipowner can be liable for punitive damages for merely its privity and knowledge of the acts of its management company. Accordingly, this Motion could also have been granted on these grounds.

**GRANTED**; and Petitioner Atina Maritime Limited's Partial Motion for Summary Judgment is **GRANTED**. Claimants' claims for punitive damages are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana this 3rd day of April, 2023.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**